Good morning. May it please the court. My name is Gina Tufaro and I represent the appellant in this matter, Mr. David Gelber. I would like to reserve three minutes for rebuttal. I apologize to the court. I have a cold. I'm going to try not to have a coughing attack. I promise. We are here today because the district court granted summary judgment to Toyota and denied class certification to Mr. Gelber. Counsel, help me on something here. You need there to be something wrong with the ABS braking system in order to get to first base. And it looked to me like the best claim you had for something being wrong with it is that it did not comply with the original specs. However, it looked like the original specs, they weren't government specs or industry standard specs or anything like that. It looked like they were Toyota's original computer coding specs. I didn't see why that was a defect. It would seem like any job that you're doing, you can start off saying, we'll do it this way. And then as you go, you find that something else works fine. And so you switch to something else. And it's not a noncompliance with Toyota's specs if Toyota says this is how we're going to build them. Even if the way Toyota said this is the way we're going to build them changed during the course of design and construction. What am I misunderstanding there? Okay. So this is an extremely complicated case. It doesn't seem that complicated to me. That won't amount to a defect. No, no, no, no. It's not that. It's just that. So the code and the specifications, it's an extremely complicated process. And it's also a learning process for us. We don't have, obviously, the institutional knowledge. I've written computer programs. Everybody's written computer programs, I guess. Everybody? I definitely have not. I definitely have not. But you write a whole lot of lines of code to do something. And then as you're doing it, you realize there's a simpler way to do it. That, I think, was not really what we had intended on focusing on, especially in the briefing. The defect, as we have alleged it, and it has evolved over time, certainly, is that you have specifications that require repressurization at a certain rate. That repressurization is extremely important because there are consequences when you don't repressurize. So it's not so much what you're talking about. It's did the code and the specifications marry each other? If you go over a bump and your brakes let up because the computer thinks it's ice, then it's really important that your brakes have pressure again and stop stopping you again as soon as you're over the bump. That's exactly the defect. If they do stop you and they stop you within such a small number of inches that it has no practical effect, so what? So that's a good question. And our expert did not say that it stops you within just a small number of inches. As a matter of fact, when Dr. Limpert went ahead and he examined the extended stopping distance out of the 36 runs, you saw the smallest amount was 2.1 feet and the largest amount was over 20 feet. That was just a bizarre test, though. I mean, he told the drivers, don't put your foot down harder, don't let your foot up, keep it at a constant pressure. It's hard to imagine anyone driving that way. Also, he picked just a few examples out of the sample. So he originally had 123 runs. Seventy-seven of those exhibited extended stopping distance. That's 62 percent. That's a large number. He defined extended as six inches. And with that small a number of runs, there's just no reason to sample them or choose a few from them. If you're getting an average, there's no reason not to have a denominator of 127 or however many runs it was. Well, I think that, and even Toyota will tell you that the specifications and the code, it is complicated. But the issue for today is whether or not Mr. Gelber and his expert have established genuine issues of material fact with respect to the existence of the defect. And for class certification, whether we've met. I'm sorry to interrupt you, counsel. But I think I have a similar question that Judge Kleinfeld had, and I'm not sure that I quite understood your answer. And I'll candidly admit the reports here were very difficult for me to decipher and comprehend. So I struggle with that. But as I understand it, the theory of the defect below really had to do with some sort of source code programming defect. Is it the case now that on appeal, that's no longer the theory of the defect? And now the theory is that it was actually programmed correctly, but they're not. The brakes aren't functioning the way they're designed to do because of this repressurization problem. Am I understanding that? That is correct. And it's not that it changed for purposes of the appeal. I think that, you know, look. It changed in the sense that that was an issue. The source code issue was presented, and that was a big part of the summary judgment ruling. And as I understand it from the briefing as presented before us, there's no longer a theory of a programming defect in the source code. There's a concession that, yes, it was actually programmed correctly, but it's not operating the way it's supposed to. That is correct. And so the specifications are no longer an issue as well. The discrepancy between the specifications and the source code, that's no longer an issue. That's correct. Right, right. So what you're referring to is what we've called Condition A and whether or not they matched each other. It's kind of evolved to what Judge Winn was discussing right now. As to the repressurization issue, one of the criticisms that the district court had as to Dr. Limpert's report is the use of the six-inch benchmark, I guess, as a measure of unsafe stopping distances. And where is that coming from, and why is the determination that that six-inch benchmark was untrustworthy, unreliable? Why should we overturn that particular finding by the district court? Okay, for two reasons. One, I think it's really important that we understand the distinction here. We're not talking about anybody taking issue with Dr. Limpert's methodology in actually calculating extended stopping distance, okay? Because that is based on very well-accepted, generally accepted calculations. Nobody took issue with that. The issue is what constitutes, quote-unquote, unsafe, okay? Somebody could say... I have the same question. How did he arrive at six inches as being the point at which it became unsafe? Right. So Dr. Limpert was asked during his testimony that question, and based upon his over... He's been working for almost 60 years. He does accident reconstruction. He's a brake engineer. He's worked in Germany. He's worked for NHTSA. That's based upon all of his industry experience. If you want to know what's unsafe with respect to accidents, the best expert to ask is an accident reconstructionist. Because he said that's what he did? No, that's based upon his industry knowledge. What industry knowledge? I mean, that sounds like a Daubert thing. I'm an expert. You have to accept whatever I say, and you have to let me testify. That's just what Daubert said no longer flies. Well, one of the issues is what is your expertise in Daubert? It's not just are you an experienced person in something. It's how can you support by peer-reviewed literature or other things your claim that this is a proper standard. I understand exactly what you're saying. I think that Dr. Limpert has all these years of experience as an accident reconstructionist. I think that that should be enough to support. The court may disagree with me. I understand that. And I think that it's also important to keep in mind what we're talking about is nobody's attacking the methodology for actually calculating extended stopping distance. And another thing to think about that's really important is if you look at the extended stopping distances, we're not talking six inches. I just told you, even for that 36, we're talking someplace between 2.1 and 20 feet. But I thought he said that six inches is the point at which it becomes dangerous. He didn't say that? Yes, he did. Absolutely, he did say that, Judge. So those are the issues I think that what we really have to focus on is with respect to the defect, there were 123 runs, 77 of them. I couldn't see why his runs mattered. I mean, back when we learned to drive, what you learned was pump the brakes. Don't press hard on the brakes. If he starts skidding, let up on the brakes. And after ABS brakes came into existence, then what everybody did was the opposite. Instead of being told to take your foot off the brake, you were told keep your foot firmly on the brake. The car will take care of the pumping. But he's telling people, don't do that for my tests. The standard response that they used to train people out of was let up on a brake so you can get control of your skid. And the new thing that was taught to everybody after ABS brakes was you just stand on the brake and the car will take care of letting off on the brake as needed so you can keep your directional stability. But he told his drivers for those tests, don't stand on the brake, just maintain a constant pressure. And I can't see why that would produce a valid test of anything. Okay, so what I think is important is that Dr. Limpert spent his opinion six of his report, of his supplemental report, I believe it is. He spent that entire opinion explaining the physics of what he actually did tell the driver to do. And what he did is he explained that what's important is the consistency of the driver-commanded force. What's important for this analysis is to ensure that the driver-commanded force is sufficient for brake system to generate equivalent stopping force and therefore deceleration. But wouldn't it be important for the test to replicate real-life driving conditions in order to show a defect in the ordinary operation of the vehicle? I think that it did. I think maybe there's a misunderstanding about how these tests went down. I don't think that Dr. Limpert said don't stop your vehicle. Obviously, the vehicles came to a stop. And they had to come to a stop in some way. But that was just the point. How long did it take the vehicle to come to a stop? And it would make a difference whether or not you drove the vehicle under real-world driving conditions or if you had an artificial method of driving the vehicle so as to make it stop at a longer distance. I think that was the concern. Right. I think that the point is that nobody jammed down on their brakes. Nobody slammed them. What instructions were the test drivers given? Exactly what I had just read to you, which is to modulate your foot so that you're commanding the same force so that the vehicle could – sorry, I don't want to missay it. So modulate means to change. It was to just use the proper amount of force so that the vehicle could maintain the same amount of deceleration that it would have before the defect had manifested itself. That's not what drivers are taught. It's not what instruction manuals say to do when you have ABS brakes. I think that Dr. Limpert tried to explain. Probably I'm not doing the best job of explaining it to the court with respect to how it replicated, but at the end of the day, you have to ask yourself, you know, did we establish that genuine issue of material fact? With respect to class certification, the relevant issue is whether or not we have established, we've met the burden for class certification. Not should the court come in here and should the court say, I disagree with your defect. That is not what we're supposed to be doing. Kumo Tyer says he's supposed to be able to point to some documentation, publication, government standard, industry standard, something to show why he's using the benchmark that he is, six inches in his case. And did he? Not that I'm aware of. Judge, I'm actually passing my time. I'd like to reserve the rest for Roberto. Actually, can I ask one question before you sit down? Otherwise I'm probably going to forget about it when you stand up again. You kept saying that no one is taking issue with the methodology of Dr. Limpert's test, and that's not the way that I view this record. And Ms. Ruto can address this more, but the court in its summary judgment ruling below repeatedly cited to 702 and said he wasn't going to give weight to various arguments, including some of the testing relating to repressurization, which you're saying is the issue on appeal. So if this court decides that the district court did not abuse its discretion in excluding the portions of Dr. Limpert's opinion regarding unsafe stopping distances, do you then lose? I'm sorry. I missed that last part of the question. Do you lose? Do you lose? I don't think so. I don't think that the district court ruling was proper. Sorry, I had a moment. No, I don't think so, because we have extended stopping distance. Something is wrong with these vehicles. Okay. Look at there's extended stopping distance in 77 runs. Okay. If you want to say what's unsafe. But listen to my question. If we find that the district court properly disregarded Dr. Limpert's testimony or evidence regarding unsafe stopping distances, do you then lose? Meaning what other admissible evidence should we look to to see whether it's sufficient to create a genuine issue? You still have the plaintiff who had extended stopping distance. You still had other people who testified that there were an accident. Somebody almost hit somebody in the crosswalk. You still have charts that plaintiff's counsel has demonstrated which for class certification need not be admissible. So there's still other evidence that the court can look to. Thank you, Your Honor. Go ahead. Was there standing water on the course on the day of the tests? Meaning from rain that had already come by? I think that there was testimony that it had rained for one or a few of the runs, but for the most part that the track was dry. Did Dr. Limpert control for the wet pavement? It takes longer to stop on wet pavement. Did he control for it? I think that he had testified that there were periods of time where he tried to wait for it to dry, and there were also times where Dr. Limpert actually used a watering truck to actually create a wet condition. I had thought that he did not control for the water in the sense of expecting a longer stopping distance when the pavement was wet. I mean, if it's with respect to a watering truck, I know that he did have a watering truck, and he did testify that he did have the watering truck go here, go there, and do it like that. Thank you. All right, counsel, we'll give you a couple of minutes. Thank you so much. I appreciate it. We hope that you use your time. Thank you. Good morning, Your Honors. Theodore Boutrous for Toyota Motor Sales and Toyota Motor Corporation. Let me start with Dr. Limpert because I think the questions that Your Honors were asking go right to the heart of this. He was asked during his deposition, he came up with this six-inch benchmark literally out of thin air in the deposition. It was not something that he had even included in his reports. In his testimony at page 3042 of the excerpts of record, when he was asked if there were documents that refer to the six-inch criteria, he said no. He then was asked, that's something you, Dr. Limpert, established yourself mentally. He said correct. And then counsel asked, and there's no standard, there's no EC or federal standard, anything in the industry, anything of that nature which would confirm that as an appropriate standard. And he answered, you mean the six-inch cutoff point? Yes, sir. And the answer is I have not made any survey whether there is or is not a standard concerning extended stopping distance. So opposing counsel said that no one took issue with the methodology that was used by Dr. Limpert. Do you agree with that? I completely disagree with that, Your Honor. We do, as Your Honor was pointing out, disagree with the methodology on multiple fronts. So first, this benchmark for determining whether an extended stopping distance is unreasonable and unsafe is arbitrary and unreliable, as the district court found. That was not an abuse of discretion. Dr. Limpert admitted that his methodology, which was this standard, was arbitrary. He admitted it in his deposition. Secondly, as Judge Kleinfeld was pointing out, in the district court found several points, other parts of his methodology were unreliable and divorced from the real world, so there wasn't a fit between what he was doing and what he sought out to prove. So the brake pressure issue. You're talking about even though it's ABS brakes telling the driver don't stand on the brakes? Exactly, Your Honor. It's from a common sense standpoint, it makes no sense, number one. Number two, it's totally contrary to the real world performance, and even Dr. Limpert admitted he would put in more pressure if there was an ABS activation and a pause in the braking pressure, and that has a huge effect on the performance of the vehicle. I'm not an expert, incidentally. It's odd having a products case where it isn't a battle of experts, but all we're really talking about is Limpert. We had superb experts, and in fact on the brake pressure issue I was going to give you an example. Toyota's experts looked at the brake pressure modulation, and footnote nine of the district court's ruling talks about the testing that Toyota's experts did, including pure testing but with brake pressure, and it's undisputed that with a modest increase in brake pressure, even using this faulty, flawed methodology of Dr. Limpert, it completely eliminates any extended stopping distance, and that testimony from Toyota's experts was undisputed. So what you're saying is if you do stand on the brakes, there's no extension of stopping distance? Exactly, even using the methodology of the plaintiffs. Even using the six-inch benchmark? Exactly. It eliminated completely. In fact, the stopping distances were lower than what Dr. Limpert said would be acceptable. So it's a really bogus theory. The other thing is the cherry-picking of the results. That is not a correct statistical methodology, engineering methodology. Forty-four of the results that Dr. Limpert excluded showed zero extended stopping distance. Did he explain why he excluded those results? No, Your Honor. He just picked the ones that were most favorable to the plaintiff, which if that doesn't violate Kumho-Tyre, Daubert, General Electric v. Joyner, the Supreme Court's cases, this Court's cases on what an expert should do, I don't know what would. Before Kumho-Tyre and Daubert, there would have been a different approach, and Kumho-Tyre and Daubert strike me as going awfully far to impose a theory of what scientific inquiry is. It's different from what scientists actually do, and a lot of courts have chipped away at them for that reason, including the Supreme Court subsequently. I can see where an expert might say, well, yeah, most of the time it works fine, so I'm not looking at the ones where it works fine. I'm looking at the ones where for no good reason there's a little wrinkle in the pavement, a little bump or minuscule pothole, and you can't stop the car in a reasonable distance. Instead of stopping it in 120 feet as it would on smooth pavement, it takes 200 feet. So I'm just going to look at those and say, what happened here? Just the way when you're doing accident reconstruction on an airplane accident, you don't look at all the planes that landed safely. You just look at the ones that crashed. There's no question that from a scientific standpoint or engineering standpoint, doing case studies, looking at something that happened with a particular incident, or even looking at Mr. Gelber's car here, no one did that. So his experts did not conduct any analysis of the car that's at issue. Gelber's car worked fine. It allowed him to steer when he had an ABS activation. So there's no question that an expert can look at specific incidents, but you can't draw general conclusions by cherry-picking the results, by having an unreliable method, by instructing the driver to do things. Well, I don't necessarily agree, Your Honor, because we don't know if it's intermittent. An intermittent defect is a defect. Where there's no defect at all, then there's no defect. But a defect, oh, like those General Motors ignitions, I don't know if this is true or if it's been proved yet, but at least the theory that if you have a heavy key chain, your car can die on the freeway. That would be an intermittent thing. It wouldn't happen to all the cars. It could manifest in different instances, but to determine whether it's a defect that's causing the problem, and I want to get to causation here in a second. Judge Kleinfeld, you sort of started out with that point. You'd need to have a scientifically valid study that provided statistically significant results, and you're not allowed to, in order to draw broader conclusions where there's some sort of defect that could cause problems in all the vehicles by just doing a non-statistical survey, doing tests where you instruct the driver to do the opposite of what a normal human being would do in the real world. Does the instruction book, the manual that comes with the car, say basically you'll sometimes feel the ABS brake system operate, don't let up on the pressure, just stand on the brakes? That's a very good question. I don't know the precise answer to that. It used to be back in the 70s, I drive on ice for much of the year. I grew up doing that. North Dakota for me. Same thing. It used to be you'd let up on the brakes when you'd start skidding, and now you just stand on them and the car stays in a straight line and stops. That's the irony. You haven't been nuts about your speed. Yes, and that's the irony here. This analog brake system is an ingenious transformative safety device, and it functions in these tests. Your problem here is it sometimes makes a mistake. It gives you false positives. It thinks there's ice when there's a little pothole or bump or pebbles in the wrong place. But it's really not a problem, Your Honor. It's designed because it's, I mean, we're talking milliseconds, and so it's knowingly designed to react that way because you can't have it pause long enough to determine whether it's a bump or whether it's ice. But to counteract that, the system very quickly, in milliseconds, determines based on wheel speed, braking pressure, brake, the activation timing, whether it's ice. I think what you're saying, and more concretely tell me if I understand it, is, yeah, it gives you a false positive. The car thinks it's ice when you go over a bump, but it so quickly corrects itself and corrects its false positive and the computer figures out it's not ice, that it doesn't affect the stopping distance materially. Exactly, Your Honor. It's a marvel of technology, and it's comparable and exceeds pure vehicles. Our experts, you asked about Toyota's experts, tested and compared using the state-of-the-art methodology, not this driver-dependent methodology, and compared the Gen 2 Prius to pure vehicles and found that it was comparable or exceeded the performance of those vehicles. This is how the system works. Does the plaintiff have a comparison with other vehicles? They did not. Their experts conceded they did not make any comparative analysis. So it's really in a vacuum. And going back, I think this was an important concession regarding what the theory is now, because this has been a case, I think of it, the theme of this case from the plaintiff's perspective of searching, searching for plaintiffs. They started with seven. They were all gone. They brought in Mr. Galbraith, searching. Did they have some people that had actual accidents? I mean, the best this fellow had was one time a cab darted in front of me, and I almost hit him, but he didn't hit him. Did they have some accidents? They had an individual who had an accident who was a plaintiff originally, but if you look at the facts of that person's situation, the system worked. It allowed her to steer and avoid a collision when the vehicle had been in a sliding situation. So there was no collision? There was no collision, and the system, the way I read it, it was at the complaint stage before she got out, but the system worked. So it was just a whoo, that was close? Right. Were there any collisions? Not that I know of, Your Honor. In the original, these people ultimately, perhaps because they recognized there wasn't really a case here, dropped out of the case. The original case focused on four vehicles, then came down to the Gen 2 Prius, which is an award-winning vehicle in terms of safety, and there's never been a question from federal regulators or anyone that this model vehicle had anything but state-of-the-art effective system. And the concession now that it's not the software programming, because I think the court recognizes their software expert, who did not make any opinions about the real-world performance or safety, he conceded that the repressorization software code was implemented correctly. And he had no basis for analyzing the cause of whatever the test results are. The way I'm remembering it, he was an engineer. He'd come up with the original program, and when they changed the way they made the software, his view was they shouldn't change the software. Right. But then he conceded, well, it really didn't make any difference? Yes. And here, we cited this court's decision in Wilson v. Hewlett-Packard, which is, I think, directly on point. It was about a laptop computer and the claim that a power cord defect was causing laptops to start on fire. And this was at this pleading stage, and the court said, we've alleged a defect. Now, where's the analysis and the facts there? And here it would be, where's the expert testimony showing that some defect caused the thing you're saying occurred and it's unsafe? Here, there's no testimony. The court, the simplest way to resolve this case is to ask yourself, where's the testimony that some problem that is contained in the software somewhere else caused something to happen in that testing? Counsel, you indicated that this is very sophisticated technology, and as I indicated, the reports were really difficult for me to understand. But part of Toyota's experts' response to Dr. Limpert is that his methodologies flaw because repressurization just depends on so many different factors, many of which has to do with the driver and how the driver handles situations as well as road conditions. So I'm just curious to see how the plaintiff could ever really prove that the ABS brakes didn't function as they're programmed to do. And I think you touched on it. One of the testing done by your experts is really in peer review. Was there any rebuttal expert testimony that addresses specifically the peer review results that Toyota proffered? The closest that the plaintiff's expert came was to take one of his test runs, the one where the driver had let off the brake pedal by 45 percent. So not only did he keep it constant, he didn't just keep it constant, he let off the brake pedal. He took one of his results and then compared it to the averages of the peers that Toyota's expert had tested against, and he claimed that showed performance that was beneath the peers. But he conducted no peer testing. It's a total apples and oranges. They were under different testing circumstances, different speeds. And so there's nothing, no reasonable jury could rely on that analysis to find in favor of the plaintiff. I'm sorry. Counsel, before your time is up, I wanted to ask you, what's your response to opposing counsel's listing of additional information that she said would create a genuine issue of fact, even if we disregard Dr. Olympic's expert opinion? Your Honor, the items that counsel listed do not create a genuine issue of material fact. The testimony from Mr. Gelber was that his vehicle, he drove it for 40,000 miles, he had one event where the ABS activated, he went to cab dart it out in front of him, and he was able to steer, which is one of the key features of the ABS system, is keeping the ability to steer. That doesn't create a genuine issue as to whether there's a defect in the software that's a common defect that is affecting all the vehicles. So I think that fails on that front. The other testimony, a couple anecdotes, that doesn't prove a defect in the vehicle. There's no factual predicate. It's an expert case. They've got another expert whose name I've forgotten. What about him? Let me talk about him because he, again, I think seals the deal for summary judgment. His original theory was that the whole system was defective because it detects, it activates the system when it hits a bump, makes the quick determination, and then reactivates the brakes. He'd abandoned that theory. He then, his main theory in the district court was the so-called Condition A, that the specifications didn't match the ultimate source code. And as Judge Kleinfeld pointed out, that doesn't prove a defect. It was a constant improvement. The testimony was undisputed that it was a blueprint. So what he's left to testify, and he said very clearly, Your Honor, he was not qualified. He admitted he was not qualified to talk about the real-world effects of the software code. He was not qualified and had no opinions on whether any of the software issues he was pointing to had caused any safety problem. And so he admitted the repressurization source code was correctly implemented. And all he could do, and this is at page 284 and 285 of the excerpts of record, he said, Based on Dr. Limpert's testing, there must be some defect in the software. There must be some problem. What was his second theory? The first theory was it gives false positives. Yes. It's going over a bump as ice. And then the second theory was? The second theory was that he found what he called Condition A, that the specifications would have had the rear wheels making independent determination of a step or a bump, independent of the front wheels, and that the ultimate source code did not include that feature. And the plaintiffs have now abandoned that theory. He called that Condition A. That was their main focus below. And as the district court found, there was no evidence, one, that that was a defect or problem. There was no evidence from anyone linking that to any safety problem. And now they've abandoned that theory. And so right now, Dr. Bagherzadeh's testimony has no impact on any issue in the case because he can't look at Dr. Limpert's testing and assume a defect. One, it's beyond his expertise. Two, Dr. Limpert's testimony was unreliable, excluded, inadmissible. And so it's completely circular. So I don't think that other expert helps them at all. All right, thank you, counsel. Thank you, Your Honor. All right, we'll give you two minutes for rebuttal. Counsel? Thank you. Actually, just two points of clarification. One of the former plaintiffs, Leora Kahn, she did testify that she had an accident. The other issue that I just want to briefly discuss is that when Judge Winn was talking about the other factors that the lower court said should have been analyzed by Dr. Limpert, the citation actually was from Dr. Martin's report. And if we look at it, it says he's citing to a complicated map about the software. And he says, as I will describe below, there are many factors that influence the two-part process of step detection. This is very important because what he's talking about are the factors that go into deciding whether or not a step or a bump has actually been detected, not factors that go into deciding whether or not I should repressurize. So step detection is, let's think about that as A, part A. Once you get to part A, then you can get to part B. So we're talking, our theory is about part B. And these factors that he's talking about analyzing, that goes to step detection. That's part A. I don't have anything else. All right, thank you, counsel. Thank you very much. Thank you to both counsel for your helpful arguments. The case just argued is submitted for decision by the court.
judges: Kleinfeld, Rawlinson, Nguyen